FILED
MAR 16 2016
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | **4:16CR00113 RLW** |
| DONALD NOVAK, ) | |
| Defendant. ) | |

### INFORMATION

The United States Attorney charges that:

### General Allegations

1. At all times relevant, DONALD NOVAK ("NOVAK"), the defendant herein, resided in the Eastern District of Missouri.

2. At all times relevant, NOVAK was a licensed insurance agent and broker for various insurance companies including North American Company for Life and Health Insurance ("North American").

3. At all times relevant, North American, based in West Des Moines, Iowa, offered various types of annuities including, but not limited to, flexible premium deferred fixed annuities.

4. An annuity is a contract between an insurance company, such as North American, and a client and is designed to meet the client's retirement and other long range needs. When a client purchases and invests in a deferred annuity, the sum and/or premiums paid are invested and held by the insurance company over an accumulation period designed to give the amount

invested time to appreciate. Then, at some point in the future, the account value is repaid to the client. Retirees and others often use a fixed annuity to provide a steady income for life.

5. A typical feature of a deferred annuity is a surrender penalty for an early withdrawal of the funds contrary to the terms of the contract. Thus, a deferred annuity is not suitable for some investors because it is designed to be held as a long term investment and contemplates that the client will not need to access the invested funds in the short term or to meet their current living expenses.

6. An agent or broker, such as NOVAK, who sells an annuity offered by North American would be required to first confirm to North American the suitability of the investor as part of the annuity application and also certify that the investor understands the nature of the investment and the penalties associated with an early withdrawal.

7. The sale of a North American annuity by an agent or broker, such as NOVAK, would generate a commission payment from North American Life Insurance Company to the agent or broker.

8. In his capacity as a licensed insurance agent and broker, NOVAK established and maintained a fiduciary relationship with one and more clients. On or after July 28, 2011, NOVAK established such a client relationship with his distant cousin, R.H.

9. R.H. was born in 1953 and is presently 62 years old.

10. At all times relevant, R.H. resided in St. Louis, Missouri. At all times relevant, up until July 28, 2011, R.H. lived with his father. R.H. has never been married and has no children.

11. R.H.'s father died on or about July 28, 2011.

12. While able to live independently and manage ordinary daily affairs, R.H. has certain mental limitations which impair his ability to understand and appreciate financial concepts and transactions. Specifically, R.H. lacks the mental capacity to understand complex financial transactions and independently manage his own investments.

13. At all times relevant, R.H. lived a simple life and had modest living expenses.

14. Through saving and conservative investing, R.H.'s father had accumulated, at the time of his death, in excess of $2,000,000 in savings and investments. R.H. was the designated beneficiary of his father's savings and investments. R.H.'s father structured his savings and investments such that R.H. would inherit or otherwise directly benefit from his funds and assets when he died.

15. Beginning on or about July 28, 2011, R.H. became a client of NOVAK. NOVAK, in his capacity as an agent and broker, then began directing and managing R.H.'s assets including those funds and assets R.H. inherited from his father.

16. Beginning on or about November 15, 2011, NOVAK also became R.H's power of attorney. NOVAK also used the power of attorney to direct and manage R.H.'s assets.

17. At all times relevant, NOVAK acted in a fiduciary capacity as to R.H.'s assets.

18. At all times relevant, NOVAK was aware that R.H. had certain mental limitations which impaired his ability to understand and appreciate financial concepts and transactions and that R.H. lacked the mental capacity to understand complex financial transactions and independently assess and manage his own investments.

## The Scheme

19.     Beginning on or about July 28, 2011, and continuing through on or about July 30, 2015, the defendant, DONALD NOVAK, with the intent to defraud, devised a scheme to defraud R.H. of funds and assets, including, but not limited to, funds and assets invested in annuities from North American, through the use of material false representations, pretenses and promises, both express and implied, in order to misappropriate and convert those funds to NOVAK's own personal use, including, but not limited to, purchases, by NOVAK, of real and personal property in his name and payments, by NOVAK, of NOVAK's personal expenses and the personal expenses of his immediate family.

## Manner and Means of the Scheme

20.     The manner and means of the scheme are further described as follows:

    a.     It was part of the scheme that NOVAK, acting in a fiduciary capacity, engaged in multiple financial transactions and investments with R.H.'s funds knowing that R.H. lacked the capacity to understand those transactions and investments.

    b.     It was further part of the scheme that NOVAK liquidated multiple holdings and assets R.H. inherited from his father. As R.H.'s power of attorney and as R.H.'s agent and broker, NOVAK then used the majority of the proceeds to purchase annuities for R.H. from North American. As the broker and agent for the purchased annuities, NOVAK received commission payments from North American. As the broker and agent for the purchased annuities, NOVAK represented to North American that: 1) R.H. was a suitable investor; 2) R.H. would not need the invested funds to meet his current living expenses; and 3) R.H. understood that surrender penalties would apply if an early withdrawal was made from the invested funds.

c. It was further part of the scheme that, on several occasions, between on or about June 28, 2012 and on or about July 30, 2015, NOVAK made, and attempted to make, cash withdrawals from the annuities owned by R.H. In order to make said withdrawals, NOVAK submitted a series of partial surrender requests to North American. Typically, R.H. incurred penalties and taxes as a result of the surrenders submitted by NOVAK. R.H. was typically unaware of these transactions. To the extent that NOVAK notified R.H. of any such transaction, NOVAK knew R.H. lacked the capacity to understand the transaction.

d. It was further part of the scheme, and as part of the partial surrender requests, NOVAK represented to North American that the partial surrenders were authorized by, and for the benefit of, R.H. when, in fact, NOVAK knew that: 1) the partial surrenders were not legitimately authorized; 2) the partial surrenders were not for the benefit of R.H.; 3) R.H. lacked the capacity to understand the transactions with North American or any surrender penalty associated with the transactions; and 4) R.H. was typically unaware of how much money was being withdrawn and how the money withdrawn was ultimately spent.

e. It was further part of the scheme that, based upon NOVAK's misrepresentations to North American, North American processed the partial surrenders as requested and paid out the sums withdrawn from R.H.'s annuities pursuant to NOVAK's directions.

f. It was further part of the scheme that, per NOVAK's directions to North American, the partially surrendered annuity proceeds were deposited directly into NOVAK's personal bank accounts.

g. It was further part of the scheme, and contrary to his representations to North American and the fiduciary obligations he owed to R.H., that NOVAK then spent the surrendered annuity proceeds primarily for his own benefit and for the benefit of his immediate family members.

h. It was further part of the scheme, and contrary to his representations to North American, that NOVAK used the partially surrendered annuity proceeds to make real and personal property purchases in his name and for his own benefit and the benefit of his immediate family members including, but not limited to, purchases of automobiles, boats and a lake house. NOVAK also used the partially surrendered annuity proceeds for his own living expenses and the living expenses of his immediate family members.

i. It was further part of the scheme that other assets owned by R.H. were liquidated or otherwise cashed in by NOVAK including, but not limited to, a savings bond and a life insurance policy issued by New York Life. NOVAK also spent the proceeds derived from these assets primarily on himself and his immediate family members

j. As part of the scheme and as a result of the scheme to defraud, NOVAK fraudulently obtained approximately $1,400,000 or more in proceeds from the partially surrendered North American annuities owned by R.H. Said surrenders caused R.H. to incur approximately $275,000 or more in surrender penalties and taxes.

## Count I
## (Wire Fraud)

21. Each of the allegations in Paragraphs 1 through 20 of this Information are hereby incorporated by reference as if fully set forth herein.

22. On or about August 27, 2013, in the Eastern District of Missouri and elsewhere,

**DONALD NOVAK,**

the defendant herein, having devised and intending to devise the above-referenced scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing this scheme to defraud and attempting to do so, did knowingly transmit and cause to be transmitted in interstate commerce by wire certain writings, signs, signals, pictures and sounds, namely an interstate transmission from St. Louis, Missouri to West Des Moines, Iowa, of a fax consisting of a partial surrender request form, which fax constituted a formal request submitted by NOVAK that North American approve and process a partial surrender in the amount of $600,000 from R.H.'s annuity, contract no. xxxxx5314, and deposit the proceeds from the partial surrender into NOVAK's personal checking account at First Community Credit Union, account xxxx6897, and which falsely represented that the partial surrender was legitimately authorized by, and for the benefit of, the owner, R.H. when, in fact, the proceeds from the partial surrender were for the benefit of NOVAK and were ultimately used by NOVAK to purchase real and personal property for himself and his immediate family.

In violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATION

The United States Attorney further finds by probable cause that:

23.     Pursuant to Title 18, United States Code, Section 981(a) and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Count One, the defendant shall forfeit to the United

7

States of America any property, real or personal, constituting or derived from any proceeds traceable to said offense.

24. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

25. Specific property subject to forfeiture includes, but is not limited to, the following:

    a. Real property known as 108 Myers Court, Lake Ozark, Missouri 65049, together with all appurtenance, improvements, and attachments thereon, bearing a legal description as "Lot 5, Oak Harbour Estates, Miller County, Missouri," Parcel ID #13-6.0-14-004-001-014.004;

    b. Real Property known as 1537 Polaris Drive, Ellisville, MO 63011, Parcel ID # 22U-34-0326;

    c. 2014 Lincoln MKX, VIN: 2LMDJ6JK6EBL05851;

    d. 2012 Nissan Altima, VIN: 1N4AL2AP0CC224722;

    e. 2011 Ford F150, VIN: 1FTFW1ET4BFA58498;

    f. 2009 Nissan Murano, VIN: JN8AZ18UX9W031021;

    g. 2014 Tracker Marine, Suntracker Aluminum Pontoon Boat, Model: RPB254XP3, Hull ID: BUJ19330B414;

    h. 2014 Mercury Marine Outboard Motor, Mercury 250L Verado Pro, Serial #2B031882;

    i. 2013 Evinrude Outboard Motor, Model #E175DPL, Serial #05370165;

    j. 18 foot Venture Boats, Inc., Hull ID: VNB08839L889;

  k.  1989 Boat Trailer, VIN: 1ALCEDS1UJ1022738; and

  l.  One Lady's White 18K tacori ½ Way Sculpted Crescent Engagement Ring, Size 6.5 with 0.60 Tw Round G Vs2 Diamonds, Metal Weight: 4.7, Serial #290483.

26. If any of the property described above, as a result of any act or omission of the defendant:

  a.  cannot be located upon the exercise of due diligence;

  b.  has been transferred or sold to, or deposited with, a third party;

  c.  has been placed beyond the jurisdiction of the court;

  d.  has been substantially diminished in value; or

  e.  has been commingled with other property which cannot be divided

without difficulty, the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

            Respectfully submitted,

            RICHARD G. CALLAHAN
            United States Attorney

            /s/ Charles S. Birmingham
            CHARLES S. BIRMINGHAM, #47134MO
            Assistant United States Attorney

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| EASTERN DIVISION | ) |
| EASTERN DISTRICT OF MISSOURI | ) |

I, Charles S. Birmingham, Assistant United States Attorney for the Eastern District of Missouri, being duly sworn, do say that the foregoing information is true as I verily believe.

_____
CHARLES S. BIRMINGHAM, #47134MO

Subscribed and sworn to before me this 11th day of March, 2016

_____
CLERK, U.S. DISTRICT COURT

By: _____
DEPUTY CLERK